IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2014 Session

**STATE OF TENNESSEE v. WILLIAM MATTHEW BLACK**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1125    Monte D. Watkins, Judge**

**No. M2013-00612-CCA-R3-CD - Filed April 25, 2014**

The Defendant, William Matthew Black, was convicted by a Davidson County Criminal Court jury of second degree murder, a Class A felony. *See* T.C.A. § 39-13-210 (2010). The trial court imposed a Range I sentence of nineteen years' confinement as a violent offender. On appeal, he contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by admitting into evidence his police statement, (3) the trial court erred by permitting the State to strike potential jurors on the basis of race, and (4) the trial court erred by failing to include aggravated assault in the jury instructions. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Manuel B. Russ (at trial and on appeal) and Lee Sprouse (at trial), Nashville, Tennessee, for the appellant, William Matthew Black.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Hugh T. Ammerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the shooting death of Carlos Avinger on February 18, 2011. At the trial, Metro Police Officer Gerald Hyder testified that he responded to a shooting at the J.C. Napier housing project. He said that when he arrived, he saw about forty people huddled under a tree, that he asked the people where the victim was, and that people pointed to the victim's location. He found the victim lying on the ground and said a large amount of blood

was coming from the left side of the victim's head. He said that someone had placed a pillow under the victim's head and that he could not find a pulse. He rolled the victim over to look for additional wounds and found a gunshot wound in the victim's back. One of the bystanders identified the victim as "Yellow." He said the bystanders began to leave when the ambulance arrived.

On cross-examination, Officer Hyder testified that he arrived about one minute after the 9-1-1 call was received by dispatch officers. He denied knowing when the shooting occurred. He said his focus was to provide medical assistance to the victim, not identify witnesses or obtain statements. He denied searching the victim and agreed someone might have removed items from the victim's clothes or moved shell casings at the scene. He did not see any cars drive through the area after he arrived until the paramedics arrived.

Metro Police Crime Scene Officer George Ward testified that it took three to four hours to process the scene. He identified the diagram created by Crime Scene Technician Rhonda Evans and photographs taken at the scene, which included images of a red Toyota Camry found near the victim's location, the pillow placed under the victim's head with blood on it, and nearby pools of blood. He said one beer can, one pack of cigarettes, and thirteen shell casings were found at the scene. He said there were seven Winchester nine-millimeter Luger cartridge casings, two Hornady nine-millimeter Luger cartridge casings, and four SC nine-millimeter Luger cartridge casings. He said the Toyota Camry was transported to the police department for processing, although he did not participate in searching the car.

Metro Police Crime Scene Technician Rhonda Evans testified that she arrived at the scene around 10:20 p.m., that she took measurements of the scene for the diagram, and that she collected evidence. She learned a witness said the shooter might have been inside the Camry. She identified a photograph of the back seat of the Camry, which showed two children's car seat bases and a plastic bag on the floor behind the front passenger seat. She identified photographs of a letter from the Department of Safety addressed to William Matthew Black found inside the car and of a Social Security card reflecting the name William Matthew Black.

On cross-examination, Ms. Evans testified that she was not a first responder and that she did not know if anyone altered the locations of the shell casings found at the scene. She processed the Camry for latent fingerprints and DNA. She did not know if the Camry underwent further processing. She agreed the grade of the roadway at the scene could have altered the locations of the shell casings after being fired from the gun.

Metro Police Sergeant Daniel Henkel testified that when he arrived at the scene, the victim was being placed into an ambulance and that other officers were moving people away from the crime scene. He said his responsibilities included establishing a command center and notifying the detectives and the crime scene officers. He said that he saw about twelve shell casings south of where the victim was found and that one of the patrol officers found a potential witness. He said Officer Charles Large took command when he left the scene around 11:30 p.m.

On cross-examination, Sergeant Henkel testified that he had no knowledge that the shooting was gang related or that witnesses refused to come forward because of threats of retaliation. He agreed that people were standing around the scene when he arrived and that officers were attempting to secure it. On redirect examination, he denied seeing anyone tamper with the shell casings.

Tennessee Bureau of Investigation Agent Steve Scott, an expert in firearms identification, testified that he analyzed one bullet and bullet jacket recovered during the victim's autopsy and thirteen shell casings found at the scene. He said the bullet and bullet jacket recovered from the victim were from a nine-millimeter caliber bullet. He said the thirteen shell casings were fired from the same gun. He could not determine whether the bullet and bullet jacket were fired from the same gun as the thirteen casings. He said the casings were manufactured by Winchester, Federal, and Hornady and agreed each could be fired by the same gun. On cross-examination, Agent Scott said he could not determine in which order the casings were fired.

Giles County Sheriff's Criminal Investigator Shane Hunter testified that on February 26, 2011, he received information regarding the Defendant's whereabouts. He learned that the Defendant might have been at Frank Black's house, although the police had searched it the previous day. He said Mr. Black, the Defendant's uncle, notified the police that the Defendant was at his house. He said that a standoff with the police ensued, that gas was deployed inside the house, and that the Defendant was apprehended. On cross-examination, Investigator Hunter testified that he did not find a weapon, a passport, or a large amount of money.

Metro Police Detective Andy Injaychock testified that he was assigned to investigate the shooting. He said the 9-1-1 call was received at 9:25 p.m. and denied the Defendant made any of the calls. He said that at the scene, he interviewed Pam Kennedy, who directed them to the red Camry. He said Quintica Culp, the mother of the Defendant's child, owned the Camry. He said Ms. Culp was not home when officers went to talk to her. He said that based on his experience, many people in the area where the shooting occurred were involved in drug activity. He said his investigation showed the Defendant and the victim were at the

scene to conduct illegal drug activity. He learned the Defendant had two homes, one with his grandmother and another with Ms. Culp.

Detective Injaychock testified that he interviewed the Defendant after he was returned to Davidson County. The Defendant's statement was played for the jury. In the statement, the detective told the Defendant the statement was being video recorded. The detective said the Defendant stated previously that he wanted to get "the story straight" and cooperate with the police. The detective said the Defendant was previously read his *Miranda* rights and reminded the Defendant he could stop the interview at any time because he was in control.

The Defendant said he went to the "projects" where the victim approached him, said he had heard about the Defendant, and accused the Defendant of "running off with [his] money." He said the victim cursed him and continued to approach. He said that the victim went into Pam's house, and that he left the area, drove to Z Mart convenience store, and returned to the area. He said that when got out of his car, the victim came out of Pam's house. He stated that the victim approached him again and that he walked away to a street between the buildings. He said the victim was "right beside him" and continued to approach him. He said he walked to his car, opened the rear door, and retrieved his gun from the backseat behind the driver's seat. He said the victim looked through the car window and saw the Defendant's gun. He said the victim ran around his car, although the Defendant did not know why. He did not know if the victim was going to attempt to shoot him. He said he "just reacted" and admitted he fired "a lot of shots." He denied intentionally trying to shoot the victim. He said he thought the victim would leave the scene if he fired the gun.

The Defendant denied moving his car. He denied seeing the victim with a gun but said the victim had his hands in his pants pockets. He said that he did not know what the victim was doing, that he felt it was "going to be me or him," and that he felt threatened. He said Pam was the only person he saw at the scene. He said Pam was a "crack head" and lived in the area. He said several of his family members lived in the area.

The Defendant said Ms. Culp called him the night of the shooting, stating that her car was being towed. He admitted telling Ms. Culp to report the car stolen because he wanted to protect her. The Defendant said he threw the gun into the Cumberland River the day after the shooting. He said that after the shooting, he went to various family members' houses, that his grandmother gave him the detective's phone number, and that he attempted to contact him.

Detective Injaychock testified that "woo" was known as a "fake narcotic." He identified Detective Crumby as the second officer in the recording. He denied receiving any

information before the interview indicating the Defendant had attempted to contact his office.

On cross-examination, Detective Injaychock testified that the Defendant was cooperative. He agreed that before the recorded statement began, he spoke and the Defendant listened for about fifteen to thirty minutes and that the Defendant said the police "had it wrong." He denied the Defendant gave inconsistent information in the pre-recorded conversation. He agreed the Defendant stated that the victim was confrontational, antagonistic, and told the Defendant he did not want him around the apartments. He agreed the Defendant said that the victim threatened him and that the shooting was about a "drug turf" dispute. He agreed the victim sold drugs and did not want the Defendant selling drugs in that area. He said the Defendant left the area, went to Z Mart, returned to the area, and the victim "continued this confrontation." He said the Defendant claimed that he did not provoke or threaten the victim before going to the car. He agreed the Defendant said that the victim pursued him when he went to the car and that the victim saw him pick up the gun and pull back the hammer. He agreed the Defendant feared the victim had a weapon inside his clothes.

Detective Injaychock testified that he learned someone known as Teka might have been a potential witness, although he was unable to determine who Teka was or locate him or her. He did not recall the Defendant's stating that he fled because he feared retaliation from the victim's family but agreed the Defendant said people were looking for and threatening him. He agreed the Defendant claimed his shooting the victim was self-defense.

On redirect examination, Detective Injaychock testified that he was unaware of any threats made by the victim's family. He said many people used Pam Kennedy's porch as a drug transaction location in exchange for her receiving a small portion of the drugs. He said a dollar bill found in the victim's clothes had cocaine on it. He said neither the Defendant nor the victim was listed as a tenant on any lease agreement.

Senior Associate Medical Examiner Feng Li testified that he performed the victim's autopsy and that the victim's cause of death was a single gunshot wound to the back, which injured both lungs and caused a right hemothorax. He concluded that the manner of death was a homicide, that the victim died within minutes, and that the gun was fired at least three feet from the victim. He recovered a separated copper jacket and a bullet. He said the victim's face showed evidence of blunt force trauma, including redness on the nose, the lip, and the left cheek, which was consistent with falling face down on the pavement.

On cross-examination, Dr. Li testified that although the victim's body was negative for stippling and gunshot residue, the victim's clothing had been removed before the autopsy. He said that clothing could absorb stippling. Regarding the trajectory of the bullet, he agreed

he could not determine in what position the victim stood when the bullet struck him. He said the victim's blood was positive for THC, the active ingredient in marijuana, and agreed it was possible the victim consumed marijuana just before his death.

Upon this evidence, the Defendant was convicted of second degree murder. The trial court sentenced the Defendant to nineteen years' confinement as a violent offender. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his conviction. He argues the evidence supported his claim of self-defense. The State responds that the evidence is sufficient and showed that the Defendant knowingly killed the victim and did not act in self-defense. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this appeal, second degree murder is defined as an unlawful, "knowing killing of another." T.C.A. § 39-13-201, -210 (2010). Second degree murder is a result of conduct offense. *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-306(b) (2010). "When acting

knowingly suffices to establish an element, that element is also established if a person acts intentionally." *Id.* at § 39-11-301(a)(2) (2010). "[A] person acts intentionally with respect to the nature of the conduct or to a result of conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* at § 39-11-302(a) (2010).

In Tennessee,

a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

*Id.* § 39-11-611(b)(2)(A)-(C) (2010). Whether a defendant acted in self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). When determining whether a defendant acted in self-defense, a jury must consider "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995).

The jury's verdict reflects that it rejected the Defendant's claim of self-defense. In the light most favorable to the State, although the Defendant claimed the victim was aggressive, was hostile, was cursing, and approached him with his hands in his pants pockets, no evidence exists that the victim touched the Defendant or possessed a weapon. The Defendant admitted walking to Ms. Culp's car to retrieve his gun and firing it multiple times. The evidence shows that thirteen shell casings were recovered at the scene and fired from the same gun. The medical examiner testified that the victim was killed as a result of a gunshot wound to the back.

We conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant knowingly killed the victim and that the Defendant did not act in self-defense. The evidence is sufficient to support his conviction. He is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred by admitting into evidence his recorded police statement. He argues that the first unrecorded statement was unlawful because it was obtained without reading his *Miranda* rights and that his subsequent recorded statement was tainted by the first statement and was obtained in violation of his Fifth Amendment right against self-incrimination. The State responds that the recorded statement was admissible. We agree with the State.

At the suppression hearing, Metro Police Detective Johnny Crumby, Jr., testified that he investigated the victim's shooting and that a warrant for the Defendant's arrest was obtained on February 24, 2011. He learned on February 26 that the Defendant was in police custody in Giles County. He said the Defendant was transported to Davidson County and arrived at 5:34 p.m. He said that the Defendant was handcuffed inside the transport van, that the Defendant was agitated, that he removed the handcuffs, and that the Defendant requested a cigarette. The Defendant was provided a cigarette and was permitted to smoke before entering the police station. The Defendant also requested and was given a drink. He said they walked outside and sat at a picnic table. He said the transport van remained in the parking lot in the event the Defendant chose not to talk to them.

Detective Crumby testified that the Defendant said the Giles County officers threw tear gas into the house in which he was staying and pulled him from the attic. He denied seeing any visible injuries or thinking the Defendant had suffered physical abuse. He said that when they were sitting at the picnic table, he told the Defendant that he did not have to talk to the police but that they "would like to hear [his] side of the story." He said the Defendant responded that "the media got it wrong," that the victim "came up on him," that "words were exchanged," and that he acted in self-defense. Detective Crumby said his primary objective was to determine if the Defendant wanted to make a statement. He said that they talked for about thirty minutes and that the conversation was not recorded.

Detective Crumby testified that they went into the police station to an interview room. He said he told the Defendant that the police could not "use" the statement he made outside because he had not been read his *Miranda* rights. He gave the Defendant a rights waiver form and read and explained it to him, and the Defendant read the form and signed it. He said the Defendant was not intoxicated or under the influence of drugs and was a high school graduate. He said he told the Defendant twice that he could stop answering questions at any time. The Defendant's statement was played for the trial court and was the same recording played at the trial.

Detective Crumby testified that his firearm was holstered at his waist during the interview and agreed that he asked the Defendant if he needed to use the restroom after the interview. He said no additional officers were nearby during the interview. He said the Defendant was well-spoken, pleasant, and nice when they talked. He denied using deceptive tactics and overstating the amount of evidence the police had obtained. He denied the Defendant asked to call friends and family or claimed to have been sleep deprived.

Detective Crumby testified that after the Defendant said he wanted to "get the record straight" when they were outside the police station, he did not ask the Defendant any questions about what occurred. He said he only wanted to determine if the Defendant wanted to make a statement and if he could release the transport van. He said he sat with the Defendant as the Defendant talked, smoked cigarettes, and drank soda. He denied asking the Defendant questions. He said the Defendant did not mention not seeing a gun in the victim's hand, telling Ms. Culp to report her car stolen, throwing the gun in the river, or describing the location of the shooting.

On cross-examination, Detective Crumby testified that when he and the Defendant were at the picnic table, he told the Defendant, "We want to get your side of the story of what happened here, and this is your time to talk, and I'm going to tell the D.A.s what you said." He said that when they were outside, the Defendant said repeatedly he acted in self-defense. He denied asking the Defendant to explain how the media reports about the shooting were wrong. He did not recall the Defendant's stating the media reported that the shooting was robbery related. He agreed the Defendant was not read his *Miranda* rights outside and said he had no intention of reading him his rights outside.

Detective Crumby testified that the Defendant was in police custody when he arrived at the police station and was not free to leave. He denied his stating that he wanted to get the Defendant's side of the story was designed to obtain "a response . . . regarding the investigation," rather it was to determine if the Defendant wanted to talk to him. He said he asked the Defendant, "Do you want to tell us what happened," "Do you want to tell us your side of the story," and "Do you want to give a statement." He said he anticipated a yes or no response from the Defendant.

Detective Crumby testified that the Defendant provided much more detail in the video recorded interview than during their conversation outside the police station. He denied knowing if the Defendant had previous convictions or if he had been interviewed by the police previously. He said the Defendant did not ask any questions when he told the Defendant that the police could not use the statements he made outside and that the Defendant needed to be read his *Miranda* rights. On redirect examination, Detective Crumby

-9-

testified that the media reported that the shooting was robbery related and that the victim was shot in the back.

The trial court found that upon the Defendant's arrival at the police station, Detectives Crumby and Injaychock took custody of the Defendant and "ascertained if he was willing to communicate with officers." The court found that outside the police station the Defendant stated, "[Y]ep, the media got it wrong, I was defending myself." It found that Detective Crumby told the Defendant that his statements made outside could not be used against him and that they needed to go inside and read the Defendant his *Miranda* rights. The court found that the Defendant made voluntary statements which were not in response to "any accusatory or demanding line of questioning." The court found that the Defendant agreed to go inside the police station after being told his statements were inadmissible, that they went inside, and that the Defendant was read his *Miranda* rights.

The trial court found that when asked if the Defendant wanted to talk to the police, he neither accepted nor declined a request for an interview but said the media reports were inaccurate, admitted firing a gun at the victim, and claimed self-defense. The court found that during the first conversation, the detective did not ask the Defendant any questions about the details of the shooting. Regarding the video recorded interview, the court found that the Defendant was read his *Miranda* rights before talking about the details of the shooting, that the door to the interview room remained open, and that the Defendant communicated effectively. The court found that the Defendant was treated with respect at all times. The court found that the environment and the detective's conduct did not prevent the Defendant from making a free, voluntary, and informed choice to waive his right against self-incrimination and provide a second, recorded statement to the police.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing the correctness of a trial court's ruling on a motion to suppress, this court is permitted to consider evidence presented at the trial and at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall be compelled to give evidence against himself." Tenn. Const. art. I, § 9. A defendant "must be warned prior to any questioning [of] the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed[.]" *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444. A statement obtained during a custodial interrogation without advising a defendant of his *Miranda* rights must be excluded from the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

A defendant may knowingly, intelligently, and voluntarily waive his right against self-incrimination only after he has been advised of his *Miranda* rights. *Id*. In determining whether a defendant has knowingly, intelligently, and voluntarily waived his rights under *Miranda*, a trial court should consider the totality of circumstances, including the age of the defendant, his education and intelligence level, the extent of his previous experience with the police, the length of time of the questioning, the length of the detention before the statement was made, whether the defendant was advised of his rights, whether the defendant was injured, intoxicated, or under the influence of drugs, the defendant's health at the time of the statement, whether the defendant was deprived of food, sleep, or medical attention, whether the defendant was physically abused, and whether the defendant was threatened with abuse. *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (citing *State v. Readus*, 764 S.W.2d 666, 671 (Tenn. Crim. App. 1988)).

Our supreme court has stated that the protection under our state constitution is broader than that of the Fifth Amendment and that a rebuttable presumption exists that "a subsequent confession, even if preceded by proper *Miranda* warnings, is tainted by the initial illegality." *State v. Smith*, 834 S.W.2d 915, 919 (Tenn. 1993); *see State v. Daily*, 273 S.W.3d 94, 110 (Tenn. 2009). The critical issue is whether the "events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a constitutional right not to provide evidence against [oneself], and (2) voluntarily confessing his involvement in the crime." *Id*. In determining the voluntariness of a statement, the courts should consider coercive tactics to obtain the first statement, the time between the two statements, whether the defendant was advised of his *Miranda* rights before the subsequent statement, the length of the detention between arrest and the police interview, whether the defendant was deprived of food, rest, and use of a bathroom, the presence of intervening factors such as consulting with family, friends, or

counsel, the psychological effect of having confessed previously, whether the defendant was advised if the previous statement may not be admissible, whether the defendant initiated the conversation leading to the subsequent statement, and the defendant's sobriety, education, intelligence, and experience with the law. *Id*. at 919-20.

The evidence shows that when the Defendant arrived at the police station, Detective Crumby asked the Defendant if he wanted to tell his side of the story. The detective anticipated a yes or no response, but the Defendant made statements regarding the media's wrongful claims that the shooting was robbery related and said he acted in self-defense. The trial court credited the detective's testimony that his question was not designed to elicit a statement about how the shooting occurred but to determine if the Defendant wanted to make a statement. The record shows that the Defendant was in police custody, was not permitted to leave, and was not provided his *Miranda* warnings before making his first statement outside the police station.

Regarding the video recorded statement, the Defendant was told that any comments he made outside the police station were inadmissible because he had not been read his *Miranda* rights, and the Defendant agreed to go inside the police station to receive his *Miranda* rights and provide a statement about how the shooting occurred. Detective Crumby read and explained the waiver of rights form to the Defendant, who read and signed it. The detective said the Defendant was not intoxicated, under the influence of any drugs, or sleep deprived, which is supported by the video recording. The Defendant did not complain of any injuries resulting from his apprehension in Giles County, and none were visible during the recorded interview. Likewise, Detective Crumby did not notice any injuries.

The record shows that the Defendant was a high school graduate and was told he could stop answering questions at any time. Detective Crumby said the Defendant was well-spoken, pleasant, and nice. The Defendant was provided two beverages and asked if he needed to use the restroom. Only Detectives Crumby and Injaychock were involved in the interview, and no additional officers were inside the interview room. We note that the video recording showed the door to the interview room was open. Detective Crumby denied using deceptive tactics and overstating the amount of evidence the police had obtained, which is confirmed by the recording. The detective asked mostly open-ended questions and permitted the Defendant to describe the events leading up to the shooting. Although the extent of the Defendant's previous experience with the police was unknown, the Defendant talked to the detectives for thirty minutes outside and twenty minutes inside the police station. No evidence shows that the Defendant was abused or threatened with abuse. We conclude that the evidence does not preponderate against the trial court's findings and that the court did not err by failing to suppress the recorded statement. The Defendant is not entitled to relief on this basis.

## III

The Defendant contends that the trial court erred by permitting the State to strike five prospective African-American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Although he concedes that "it can be inferred that the court did not find 'purposeful discrimination,'" the trial court failed to make the appropriate findings after the State offered a race-neutral explanation for the use of its peremptory challenges. The State responds that the trial court properly rejected the Defendant's *Batson* challenges because the State gave race-neutral explanations for dismissing the prospective jurors. We conclude that the Defendant is not entitled to relief.

*Batson* held that the Equal Protection Clause prohibited the prosecution's exclusion of potential jurors based solely upon their race. *Id.* at 89; *cf. Georgia v. McCollum*, 504 U.S. 42, 59 (1992) (extending rule to peremptory challenges made by a defendant). In order to determine whether a peremptory challenge has been exercised based upon a prospective juror's race, the defendant must first establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96. Second, the prosecution must be allowed an opportunity to rebut the prima facie case by offering a race-neutral reason for the challenge. *Id.* at 97. If the prosecution does so, the court must determine, based upon the facts and circumstances, whether the defendant has established purposeful discrimination. *Id.* at 98. A prosecutor's race-neutral explanation must be reasonably clear and specific. *Id.* However, it need not be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 767-78 (1995). "Unless discriminatory intent is inherent in the prosecutor's explanation, it will be deemed race neutral." *Id.* at 768. However, the trial court has the obligation to examine the proffered race-neutral explanation and assess its plausibility in light of all the evidence and to determine that the explanation is not pretextual. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *see Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996).

At a bench conference during jury selection, the Defendant stated that five of the seven prospective jurors challenged by the State were African-American and requested that the State offer an explanation. Counsel noted that none of the remaining prospective jurors were African-American. The trial court requested the State's response. The prosecutor said one of the challenged prospective jurors was Haitian and difficult to understand, although the man spoke English. The prosecutor also stated that the Haitian man did not respond to the State's asking if DNA evidence was something he expected the State to present, which concerned the prosecutor. Regarding a second male prospective juror, the prosecutor stated that the man had a family member who had been incarcerated for a lengthy period of time and that the juror had contact with the family member. Regarding a female prospective juror, the State noted that her favorite uncle was incarcerated for murder and that she said it was possible she had feelings that the criminal justice system was unfair. The State believed that

-13-

the female prospective juror had reservations about the severity of the consequences of a first degree murder conviction and that she believed her uncle deserved a second chance after serving an extended period of time in confinement. Regarding another male juror, the prosecutor said the juror was a former defense attorney and noted he also used a peremptory challenge for a Caucasian attorney. Regarding another male juror, the prosecutor said that the juror was a scientist and that he routinely struck scientists from the jury because "they deal in known quantities more than your average citizen" and because "[b]eing able to prove things in the scientific community is a very high degree to make a finding of proof." The prosecutor stated that two African-American jurors remained and that the State had challenged Caucasian jurors. The trial court responded, "Well, you've made your objection and I'm going to . . . let it be there, and we'll see what happens next." Jury selection resumed, and no additional prospective jurors were excused.

The record reflects that the State challenged ten prospective jurors, five of whom were African-American, that the Defendant alleged the challenges were racially motivated, and that the trial court requested the State's response, indicating that the Defendant had presented a prima facie case of purposeful discrimination. The State provided race-neutral explanations for its exercising peremptory challenges against each African-American prospective juror. We agree with the Defendant that the trial court failed to make the required findings regarding whether purposeful discrimination was shown. We conclude, though, that the trial court's failure does not obligate this court to reverse the conviction.

In *State v. Hugueley*, 185 S.W.3d 356 (Tenn. 2006), the trial court failed to make the appropriate findings after the defendant alleged the State had violated *Batson* in the use of its peremptory challenges. Our supreme court, though, reviewed the record and concluded that the trial court did not err in determining that the defendant had not established purposeful discrimination by the State. *Id.* at 375. After reviewing the record, we conclude that the State's explanations for its peremptory challenges were clear, specific, and race-neutral. The race-neutral explanations are supported by the record, and we cannot conclude that the explanations were pretextual.

We note that the trial court's stating that counsel had made his objection and that it was going to "let it be" in the record suggests that the court was not convinced the challenges were racially motivated. We note, too, that the Defendant concedes in his brief that the trial court's not finding purposeful discrimination can be inferred from the record. "[T]he ultimate burden of persuasion regrading racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. Although the Defendant alleged generally that the State's challenges were racially motivated, he fails to present evidence rebutting the State's race-neutral explanations. We note that the record shows that two

-14-

African-American jurors participated in the deliberations.  Under these circumstances, we conclude that the Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred by failing to include aggravated assault in the jury instructions.  He argues the evidence supported the inclusion of the instruction. The State responds that the trial court properly declined to include an aggravated assault instruction.  We conclude the Defendant is not entitled to relief.

In a jury-out hearing, the Defendant requested the trial court to include aggravated assault as a lesser included offense of first degree murder to the jury charge.  He argued that aggravated assault was a lesser included offense of premeditated first degree murder and that the jurors could find that the Defendant's intent was to commit an assault with a deadly weapon but was not to kill the victim.  The court responded that it did not "see, when a person dies, having an assault or aggravated assault charged."  The record reflects that the trial court charged as lesser included offenses second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide.

In criminal cases, the trial court must give "a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge."  *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975).  An erroneous jury instruction deprives the defendant of the constitutional right to a jury trial and is subject to a harmless error analysis.  *See State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000).  A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation.  *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004).  "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law."  *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

Tennessee Code Annotated section 40-18-110 (2012) governs the issue of whether a lesser included offense should be included in the trial court's final jury instructions.  Code section 40-18-110(a) states, "When requested by a party in writing prior to the trial judge's instructions to the jury . . . , the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment[.]"  *Id.* § 40-18-110(a).  The court, though, "shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense."  *Id.*  A written request for the inclusion of a lesser included offense is required by the statute, and

"[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal." *Id.* § 40-18-110(c). Because "a defendant has a constitutional right to a correct and complete charge of the law to ensure . . . a fair trial," failure to request a lesser included offense instruction in writing does not prevent plain error review. *State v. Paige*, 184 S.W.3d 223, 229 (Tenn. 2006) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)); *see State v. Wilson*, 211 S.W.3d 714, 720 (Tenn. 2007).

Pursuant to Code section 40-18-110(f)(1), "[a]n offense is an lesser included offense if all its statutory elements are included within the statutory elements of the offense charged." *Id.* § 40-18-110(f)(1). Second degree murder is a lesser included offense of first degree murder, and voluntary manslaughter is a lesser included offense of premeditated first degree murder and second degree murder. *Id.* § 40-18-110(g)(1), (2).

The record fails to show that the Defendant requested in writing that aggravated assault be presented in the jury charge as a lesser included offense of first degree murder. As a result, the Defendant's contention is not an appropriate ground for relief on appeal. *Id.* § 40-18-110(c). We also conclude that the Defendant has failed to establish plain error. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). This court has concluded that aggravated assault is not a lesser included offense of first degree murder. *See State v. John C. Walker, III*, No. M2005-01432-CCA-RM-CD, slip op. 10-11 (Tenn. Crim. App. July 28, 2005) (applying the same test identified in T.C.A. § 40-18-110(f)(1) to conclude that aggravated assault is not a lesser included offense of first degree murder). Likewise, the evidence presented at the trial does not support an aggravated assault instruction. The Defendant stated that the victim approached him, yelled at him, and stood "right beside him." The Defendant said he felt threatened, went to his car, retrieved his gun, and shot at the victim because it was "going to be me or him." The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE